United States District Court
Southern District of Texas
**ENTERED**
November 30, 2015
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| GARY MARCUS PALMER, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-15-0583 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| *Respondent*. | § | |

## MEMORANDUM OPINION AND ORDER

State inmate Gary Marcus Palmer, represented by counsel, filed a section 2254 habeas petition challenging his conviction and twelve-year sentence for possession of child pornography. Respondent filed a motion for summary judgment (Docket Entry No. 12), to which petitioner filed a response (Docket Entry No. 13).

Based on consideration of the pleadings, the motion and response, the record, and the applicable law, the Court GRANTS the motion for summary judgment and DISMISSES this case for the reasons that follow.

### *Procedural Background and Claims*

Petitioner pleaded guilty to possession of child pornography and, pursuant to a plea bargain agreement, was sentenced to twelve years' imprisonment. Pursuant to the plea bargain agreement, petitioner waived his right to appeal, and the trial court did not grant permission to appeal. No direct appeal was taken, and petitioner's application for state habeas relief was denied by the Texas Court of Criminal Appeals.

Petitioner raises the following grounds for habeas relief in the instant proceeding:

1.    The district court erred when it determined that trial counsel had no duty to file a timely notice of appeal after requested by petitioner.

2.    The district court erred when it determined that trial counsel did not constructively abandon him during a critical stage in the criminal proceeding when she refused to file any motion to set aside the guilty plea.

3.    The district court abused its discretion when it failed to hold an evidentiary hearing.

4.    The district court erred when it determined that petitioner's plea was voluntarily and knowingly made.

5.    The district court erred when it failed to enter findings of facts and conclusions of law with respect to petitioner's claim that trial counsel failed to file a notice of appeal upon request.

These habeas grounds, as worded by petitioner, do not raise cognizable grounds for federal habeas relief.  Trial court error or abuse of discretion are generally issues of state law, not federal law.  Nevertheless, in the interest of justice and to the extent possible, the Court has construed these grounds to state federal habeas grounds.

Respondent argues that petitioner's claims have no merit and that habeas relief should be denied.

### *The Applicable Legal  Standards*

*Habeas Review*

This petition is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U .S.C. § 2254.  Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state

2

court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409.   In deciding whether a state court's application was unreasonable,   this Court considers whether the application was objectively unreasonable. *Id*. at 411.  "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102.  As stated by the Supreme Court in *Richter*,

> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state

3

criminal justice systems,' not a substitute for ordinary error correction through appeal.

*Id.*, at 102–03 (emphasis added; internal citations omitted).

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31.

*Summary Judgment*

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing

habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmovant. Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, the state court's findings must be accepted as correct by the federal habeas court. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

### *Failure to File Notice of Appeal*

Petitioner claims that he expressly requested trial counsel to file a notice of appeal, but she refused or otherwise failed to do so. Petitioner argues that counsel's refusal or failure constituted a violation of his Sixth Amendment rights under *Roe v. Flores-Ortega*, 528 U.S. 470 (2000).

Petitioner presented no evidence in his state habeas proceedings that he expressly instructed trial counsel to file an appeal. Moreover, counsel herself did not state that petitioner requested her to pursue an appeal. In her affidavit submitted on state collateral appeal, counsel testified as follows:

> I did not file a Notice of Appeal for Mr. Palmer. However on several occasions within the 30 day time period, I advised Mr. Palmer of the time limit, explained that I was not an appellate attorney and advised him to seek appellate counsel.

> On May 28, 2013, I received an email from Mr. Palmer's mother asking about the possibility of appeal. In that email, it was the first time I had ever

heard Mr. Palmer claiming he was sleep deprived and asking my opinion about the possibility of an appeal. While out of the office on vacation, I replied via my cell phone on or about June 6, 2013.  In that email, I advised him that I did not think he had a good appeal claim because of the three waivers he signed but since I was not an appellate attorney, he needed to contact one to help him.  I made it very clear that he had 30 days to file and I could not represent him on an appeal.  (Unfortunately because I no longer have that cell phone, I do not have a copy of my specific response).  On June 7, 2013, his mother emailed again thanking me for replying and asked new questions.  I again replied on June 11, 2013, after seeking more specific information about the possibility of a direct appeal from the Public Defender's Office Appellate Division.  I again advised Mr. Palmer that a direct appeal would likely not be successful and advised him of the 30 days to file a Motion and further advised him to seek an appellate attorney.

*Ex parte Palmer*, p. 59 (record citations omitted).

Petitioner alleges that his trial counsel's emails are credible evidence that she attempted to "chide[], admonish[] and bull[y]" petitioner out of his right to appeal.  This Court has carefully reviewed the emails submitted by the parties, and finds no support for petitioner's claim of being chided, admonished, or bullied into forgoing an appeal.  More importantly, petitioner fails to establish that he instructed counsel to pursue an appeal. That petitioner had not expressly directed trial counsel to file an appeal can be seen in the email letter sent to counsel by petitioner's mother.  In the letter, petitioner's mother stated that, "Marc feels that he has solid grounds to appeal his case, but he is NOT sure if it is a wise thing to do. Is there any possible way that you could talk to him? He would like your opinion and would value what you say."  *Id.*, p. 70 (emphasis in original).  This particular email letter was sent eight days after petitioner's sentencing.  Petitioner's mother sent counsel another email letter dated June 7, 2013, setting forth more questions from

petitioner.  Again, nothing in the letter evinced a request by petitioner for counsel to file an appeal.  To the contrary, petitioner (through his mother) asked whether a jurisdictional challenge could be raised through habeas corpus or whether it had to be made through direct appeal.  *Id.*, p. 71.  Trial counsel responded to the question on June 11, 2013, again emphasizing that petitioner and his mother should consult an appellate lawyer for a proper answer to their appellate questions.  *Id.*, p. 73.  In other words, petitioner's own evidence shows that he requested advice and information from trial counsel regarding the feasibility of an appeal, but that he did not expressly instruct her to pursue an appeal.  Trial counsel informed petitioner that she did not believe an appeal would be successful, but that he needed to consult with an appellate attorney.  Petitioner does not show that counsel's professional judgment regarding the feasability of an appeal was unreasonable.

In denying state habeas relief, the state trial court on collateral review made the following findings of fact:

80. Jackson repeatedly advised the applicant to seek advice from an appellate attorney, that she is not one, and would not be able to assist him in his appeal process.

81. Jackson did not file a notice of appeal for the applicant.

82. Jackson, on several occasions within the thirty (30)-day period after the applicant was sentenced, advised the applicant of the deadline, explained that she is not an appellate attorney, and advised that he seek advice from one.

83. On May 28, 2014, Jackson received an email from the applicant's mother, inquiring about the possibility of an appeal.  From that email, Jackson learned for the first time of the applicant's claim that he was sleep deprived on the day of the plea.

84. Jackson was out of the office and on vacation when she received the email from the applicant's mother. Nevertheless, she responded to the email, and advised them that she did not think the applicant had a good appellate claim because of the three (3) waivers he signed, but because Jackson is not an appellate attorney, she also advised in that email for the applicant to contact an appellate attorney to answer his appellate questions and to assistant him in the appeal process.

85. Jackson clearly informed the applicant that he faced a deadline of thirty (30) days, and that Jackson could not represent him on appellate filings and proceedings.

86. On June 7, 2013, the applicant's mother emailed Jackson once more. She thanked Jackson for replying to the previous email, and asked new questions. Jackson replied after seeking more information about the possibility of a direct appeal from the appellate division of the PD's Office. Jackson again advised the applicant and his mother that a successful appeal was unlikely, that he faced a thirty (30)-day deadline, and that he should seek appellate assistance from an appellate attorney.

*Id.*, pp. 100–02. The trial court concluded that petitioner failed to meet his burden of proof as to ineffective assistance of counsel, and denied habeas relief. The Texas Court of Criminal Appeals relied on the state trial court's findings of fact and conclusions of law in denying habeas relief. *Id.*, at cover.

To demonstrate ineffective assistance of counsel, whether at trial or on appeal, a defendant generally must prove that counsel's performance was deficient and the deficient performance prejudiced the defendant's defense. *Strickland v. Washington*, 466 U.S. 668 (1984). However, where counsel fails to file a notice of appeal, despite the defendant's specific instructions to appeal, such failure constitutes ineffective assistance of counsel. *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). In such a case, the defendant is entitled

to an appeal without showing that he would likely have prevailed on appeal. *Peguero v. United States*, 526 U.S. 23, 28 (1999).

In his application for state habeas relief, petitioner raised the following as his fourth ground for relief:

> Guilty plea was involuntary due to ineffective assistance of counsel. Almost immediately after pleading guilty, Palmer, upon having had some time to consider his decision, wanted to withdraw his guilty plea, but his attorney told him he could not withdraw the plea, or appeal the conviction, or file a motion for new trial, and took no action to have the plea withdrawn despite Palmer's wishes to do so.

*Ex parte Palmer*, p. 13. In the accompanying memorandum of law submitted with his state habeas application, petitioner further stated that, "Counsel also failed to file an appeal despite Palmer's request that she do so. This also constituted ineffective assistance." *Id.*, p. 29. In neither the state application nor the memorandum did petitioner cite any support in the record for his conclusory allegation that he requested counsel to file an appeal. Instead, petitioner directs the Court to counsel's statements that she was not an appellate lawyer and could not pursue an appeal on his behalf. Counsel's statements, however, do not establish that petitioner instructed her to file an appeal. Petitioner presents no letters, emails, or other written proof that he requested counsel to pursue an appeal, nor does he identify any particular date on which he made such request or the means by which the instruction was communicated to trial counsel. In short, petitioner fails to meet his burden of proof under AEDPA, *Strickland*, and *Flores-Ortega*, and habeas relief is unwarranted.

The state court rejected petitioner's claims of ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or *Flores-Ortega*, or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

### *Failure to Set Aside Guilty Plea*

Petitioner next asserts that trial counsel refused or failed to file a motion to set aside the guilty plea. In responding to this claim on collateral review, trial counsel testified in her affidavit that, "I did not file a Motion to Withdraw Mr. Palmer's plea. We never specifically discussed a Motion to Withdraw the Plea." *Ex parte Palmer*, pp. 59–60.

In rejecting petitioner's claim that trial counsel was ineffective in failing to move to set aside the guilty plea, the state trial court made the following relevant findings of fact:

78.   Jackson did not file a motion to withdraw the applicant's guilty plea.

79.   Jackson and the applicant never specifically discussed a motion to withdraw the applicant's guilty plea[.]

*Ex parte Palmer*, p. 91.

To prevail on his claim that trial counsel was ineffective in not moving to set aside the guilty plea, petitioner must establish that, had counsel pursued the motion, it would have been granted or that it would have been reversible error for the trial court to deny the motion. Counsel is not required to file meritless motions or make futile objections. *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *Murray v. Maggio*, 636 F.2d 279, 283 (5th

10

Cir. 1984).  Petitioner wholly fails to demonstrate that a motion to set aside the guilty plea would have been successful or that the trial court would have reversibly erred in denying such motion.  Petitioner's conclusory allegations of ineffective assistance establish neither deficient performance nor actual prejudice under *Strickland*.

The state court rejected petitioner's claims of ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to summary judgment dismissal of this claim.

### *Procedural Errors During State Habeas Proceeding*

Petitioner argues that the state court erred in failing to hold an evidentiary hearing or in making specific findings of fact and conclusions of law as to all of petitioner's claims.

The Fifth Circuit Court of Appeals has long held that "infirmities in state habeas corpus proceedings do not state a claim for federal habeas corpus relief."  *Vail v. Procunier*, 747 F.2d 277 (5th Cir. 1984); *see also Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995) (holding that an attack on a state habeas proceeding does not entitle a petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself).  Thus, petitioner's complaints that the state court failed to take certain actions during the state habeas proceedings do not raise cognizable grounds for federal habeas relief under section 2254.

11

Respondent is entitled to summary judgment dismissal of these claims.

### *Involuntary Guilty Plea*

Petitioner contends that his guilty plea should be set aside as it was made involuntarily and unknowingly as a product of deception or coercion.

In response to this claim raised by petitioner on state collateral review, trial counsel submitted an affidavit to the trial court, in which she testified, in relevant part, as follows:

> At no time did I, or anyone else from my office, coerce Mr. Palmer to plea[d] guilty. I thoroughly explained every possible outcome with Mr. Palmer. On the day of his plea, I gave him significant time to ask questions and to think undisturbed. Throughout that morning I asked him repeatedly if he was sure he wanted to proceed. I gave him am[p]le opportunity and even encouraged him to change his mind and proceed to trial instead. Mr. Palmer had been contemplating pleading for several days.
>
> On May 14, 2013, I visited Mr. Palmer in the jail to discuss the upcoming pretrial conference. His claim that he did not know about his pretrial conference date is completely untrue. During that meeting I explained to Mr. Palmer that the case was going to be handled by Judge Velasquez and that the purpose of the pretrial conference was to see where we stood and for the state to officially make their last offer before final prep for trial. At that time the current offer was 35 years and Mr. Palmer specially told me that he would plea[d] to 10 years. We had a very specific discussion and I told him that I honestly didn't think they would go that low and that maybe I could get them to 20 years. He restated that he would plea for 10 years.
>
> About an hour after I returned from my jail visit with Mr. Palmer, he called my office. He said he wanted me to know that he would sign for 15 years. I told him that I didn't think that would happen but I would see what I could do.
>
> On May 20, 2013, we appeared in court for our pretrial conference. The ADA standing in for Shannon Davis was Lacy Johnson. She was aware that the previous offer on the case was 35 years. She informed me that she had been given some authority to settle the case. She initially offered 25 years. I knew from my conversation with Mr. Palmer that he gave me authority to

negotiate for 15 years. But before I discussed a counteroffer, at about 9:45 a.m., I went in the hold over to talk to Mr. Palmer again. He again confirmed he would consider a 15 year plea. We talked about which cases he was willing to plea on, discussing several different possibilities. I told him that I didn't think that state would accept our counteroffer. Again told him that we really didn't have to do anything but the state was asking if we had a counter offer. Again Mr. Palmer reiterated that if they came down to 15 years, he would plea. I then spoke to ADA Johnson discussing the problems with the state's case. I made the counteroffer, telling her that Mr. Palmer would plea to 15 years. She said she had to make a phone call and would get back with me. About 10 minutes later she came back and, to my surprise, she said she would do 15 years. I went back to Mr. Palmer and gave him the good news. He asked me to call his Dad. Around 10:30 a.m., I called his Dad on my cell phone and put him on speaker so that they could speak directly. He told his Dad about the 15 years offer and they both agreed that it was good offer. His Dad told him that he thinks Mr. Palmer should plea but ultimately the decision was his (meaning Gary Palmer's). After the telephone conversation with his Dad, Mr. Palmer asked me a few more questions and we talked extensively about different possible variations of the plea. He specifically wanted the Aggravated Assault case dismissed. I went back and forth with Mr. Palmer and with ADA Johnson at least another hour discussing plea options and sex offender registration requirements. I was very clear with Mr. Palmer that I wanted him to be sure that was what he wanted to do. I told that I would come back in 30 minutes and let him think about it. When I returned almost 45 minutes later, Mr. Palmer said to me, if the state would do down to 12 years, he would sign for it. Again ADA Johnson and I went back and forth a few more times, and then she eventually agreed to the 12 years.

At no time was Mr. Palmer ever coerced or threatened to plea. As a matter of fact, I repeatedly asked if he was sure he wanted to plea. He repeatedly said "yes." I asked him again while we were going over the plea papers. I explained that he could go to trial. He said several times that he was certain. By the time we completed the plea papers and I answered all of Mr. Palmer's questions, we were waiting to go before the Judge about 12:50 p.m. Standing next to him, we again talked about the details of the plea (about his registration requirement, the chances for parole, etc.) I told him again that we could just go to trial, that it wasn't a problem at all and that I was ready for the trial. He reassured me that he wanted to plea. While taking the plea, Judge Velasquez was also very detailed with Mr. Palmer and asked him if he had time to consider the plea. He said that he did. I also

asked him before the Judge if he was sure and that he knew he still had a right to go to trial.  He repeatedly assured me and the Judge that he wanted to plea.

On the day of his plea, Mr. Palmer had several hours to consider his plea. We began plea negotiations around 9:50 a.m. and Mr. Palmer did not plea until almost 1:00 p.m.  At no time during those 3 hours that I interacted with Mr. Palmer did he ever say he was not feeling well or that he felt sleep deprived.  As a matter of fact, as per my usual practice, when we went before the Judge we discussed Mr. Palmer's diagnosis and his medications. I asked him if he had been taking his meds and if he felt okay and if he understood everything that we had discussed.  He assured me and the Judge that he did.

*Ex parte Palmer*, pp. 57–58.

In rejecting petitioner's claim that his plea was coerced or was a product of deception, the state trial court made the following relevant findings of fact on collateral review:

5.    The trial court finds the affidavit of Ms. Juanita A. Jackson (Jackson) filed in this instant proceeding is credible and the facts asserted therein are true and correct.

6.    Jackson is an Assistant Public Defender of Harris County, Texas.

7.    Jackson still retains her file in the primary case and reviewed the same to assist in the preparation of her affidavit for the instant proceeding.

8.    Jackson has independent recollection of the primary case.

\*    \*    \*    \*

22.   On May 20, 2013, during pretrial conference, the applicant elected to plead guilty to twelve (12) years confinement for the four (4) charges of possession of child pornography, with dismissals of the forgery, failure to comply with sex offender registration, and aggravated sexual assault of a child cases.

14

23.    Jackson visited the applicant in jail on at least nine (9) occasions.

                        *     *     *     *

26.    Jackson and the applicant regularly discussed his cases.

27.    Jackson also regularly communicated with the applicant's mother
        through phone calls and emails to answer and discuss the applicant's
        questions and concerns.

28.    Jackson's records show that the applicant's mother sent at least fifty-
        five (55) emails to Jackson, and Jackson sent at least thirty-five (35)
        reply emails to the applicant's mother.

29.    The applicant sent Jackson twenty-three (23) letters. Many of these
        letters requested and discussed the same information and issues as
        those in his mother's phone calls and emails to Jackson.

30.    Jackson wrote the applicant at least five (5) letters, provided the
        applicant copies of all his indictments, explained the relevant law in
        his cases, and mailed him copies of case law dealing with punishment
        issues.

                        *     *     *     *

54.    At no time did Jackson, or any representatives from the PD's Office,
        coerce the applicant to plead guilty.

55.    Neither Jackson, nor any representatives of the PD's Office,
        threatened the applicant with "stacked" sentences to force the
        applicant to plead guilty.

56.    Jackson thoroughly explained every possible outcome to the applicant,
        including discussion on the possibility of "stacked" sentences.

57.    On May 20, 2013, the day of the scheduled pretrial conference, the
        applicant had ample time to ask questions and to think undisturbed
        regarding his decision to plead guilty. Throughout that morning,
        Jackson asked the applicant repeatedly whether he was certain he
        wished to proceed with a guilty plea. Jackson gave the applicant
        opportunities to ask questions and discuss the cases, and even

encouraged him to change his mind on pleading guilty, as they could proceed to trial instead.

58.  The applicant had been contemplating pleading for several days before May 20, 2013:

   a.  On May 14, 2013, Jackson visited the applicant in jail to discuss the upcoming pretrial conference.  Jackson explained to the applicant the procedure of the pretrial conference, and explained to the applicant that the State would make a last plea offer, which was thirty-five (35) years confinement.

   b.  Jackson relayed the State's offer to the applicant. The applicant stated that he would not accept the thirty-five (35) years offered, but would plead to ten (10) years confinement.

   c.  Jackson and the applicant discussed the applicant's counter offer.  Jackson offered her opinion that she did not believe the State would agree to the applicant's offer of ten (10) years. The applicant again stated that he would plead to ten (10) years.

   d.  The applicant called Jackson after the May 14, 2013, jail visit, and stated that he would "sign" for fifteen (15) years.  Jackson informed him that she did not think the State would entertain the applicant's counter offer, but that she would inform the prosecutor of it.

59.  On May 20, 2013, Jackson appeared in court for the pretrial conference. A different prosecutor stood in for the regular prosecutor in the primary case.  She informed Jackson that she was aware of the previous offer of thirty-five (35) years, had been given some authority to settle the cases, and was offering the applicant twenty-five (25) years confinement.

60.  Jackson knew that the applicant asked for a fifteen (15)-year plea bargain, but nevertheless went to the hold-over area of the trial court to inform the applicant of the State's new offer of twenty-five (25) years. The applicant stated to Jackson again that he would consider a fifteen (15)-year plea. Jackson and the applicant discussed which cases he was willing to plead guilty to, and several different plea

possibilities. Jackson informed the applicant that she did not think the State would accept the defense's counter offer of fifteen (15) years. The applicant again told Jackson that he would "sign for fifteen (15)."

61.  Jackson then spoke with the prosecutor, and discussed the problems with the State's case, and informed her of the applicant's counter offer. The prosecutor stated that she had to make a phone call first and would get back to Jackson.

62.  To Jackson's surprise, the prosecutor later agreed to the applicant's counter offer of fifteen (15) years confinement.

63.  Jackson returned to the hold-over area and informed the applicant of this development. The applicant asked Jackson to call his father. Jackson did so, and turned the call on speaker-mode so the applicant and his father could converse directly. The applicant informed his father of the fifteen (15) year offer, and they agreed that it was a good offer. The applicant's father stated to the applicant that he thought the applicant should accept the offer, but ultimately it is up to the applicant to decide for himself.

64.  After the telephone conversation with his father, the applicant asked Jackson more questions, and they discussed extensively about different possible variations of the plea, including dismissals of different cases and sex offender registration requirements. The applicant specifically wanted the aggravated sexual assault of a child charge dismissed. Jackson negotiated with the prosecutor for at least another hour, and finally secured a plea deal.

65.  Jackson was very clear with the applicant that he must be certain that pleading guilty was what he really wished to do.

66.  The applicant considered the plea bargain agreement for approximately forty-five (45) minutes, and then stated that, if the State would agree to twelve (12) years confinement, then he would "sign for it" and plead guilty.

67.  Jackson engaged in negotiations with the prosecutor again, and eventually persuaded the prosecutor to agree to a twelve (12) year plea bargain agreement.

68.     At no time was the applicant ever coerced or threatened to act a
        certain way or forced to choose a certain option throughout the entire
        proceeding.

69.     Jackson repeatedly asked the applicant whether he was certain that he
        wished to plead guilty, and the applicant repeatedly indicated that he
        did.

70.     While thoroughly reviewing the trial court's plea paperwork with the
        applicant, Jackson asked him again whether he really wished to plead
        guilty, and the applicant stated that he did.

71.     Jackson explained to the applicant that he could go to trial, and did
        not have to plead guilty. The applicant stated multiple times that he
        was certain he wished to plead guilty.

72.     After Jackson and the applicant completed the plea paperwork and
        Jackson answered all of the applicant's questions, and while waiting
        to go before the trial court for the plea, Jackson and the applicant
        again spoke about the details of the plea, including the registration
        requirement, and the chances of the applicant making parole. Jackson
        informed the applicant again that, if the applicant was not certain
        about the plea, he could change his mind, as the cases could go to
        trial instead. The applicant assured Jackson that he wished to plead
        guilty.

73.     The trial court was detailed in its admonishments, and asked the
        applicant whether he had enough time to consider the plea. The
        applicant answered that he did. Jackson also asked the applicant,
        while at the bench, whether he was sure he wanted to plead guilty,
        and whether he knew he had the right to a trial. The applicant
        answered that he understood his rights, and repeatedly assured
        Jackson and the trial court that he wished to plead guilty.

74.     The applicant had several hours on the day of his plea to consider the
        offers and terms. He was clear that he wished to plead guilty when
        asking Jackson to negotiate with the State for more lenient sentences.

75.     At no time during Jackson's interaction with the applicant on May 20,
        2013, did the applicant indicate to Jackson that he did not feel well or
        that he was sleep deprived.

18

76.   Jackson did not observe any signs or indications that showed the applicant was under duress on the day of his plea.  Jackson found the applicant to be communicative and engaging that day, as he had been throughout the pendency of the cases.

77.   As per Jackson's usual practice, while at the bench, Jackson discussed the applicant's medical diagnosis and his medications. Jackson asked the applicant whether he had been taking his medications, whether he felt well, and whether he understood everything that they discussed. The applicant assured Jackson and the trial court that he had been taking his medications, that he felt okay, and that he understood everything.

*      *      *      *

88.   The applicant fails to allege that, but for Jackson's alleged errors, he would not have pled guilty but would have insisted on going to trial.

89.   The totality of the representation afforded the applicant was sufficient to protect the applicant's right to reasonably effective assistance of counsel at trial.

90.   The applicant pled guilty with an agreed punishment recommendation on May 20, 2013, and was sentenced on the same day.

91.   The trial court properly admonished the applicant in accordance with [state law] as reflected in the trial court's written admonishments, which the applicant initialed and signed.

92.   The official trial court plea documents reflect that the applicant was properly admonished as to the range of punishment and that Jackson fully discussed the consequences of the applicant's plea with him.

93.   The official trial court documents in the primary case reflect that the applicant indicated both to Jackson and the trial court at the time of the plea that he understood the charge, the plea itself, the consequences of the plea, and that the applicant entered into the plea "freely and voluntarily, in the exercise of [his] own good judgment."

94.   The docket sheets in the primary case also indicate that the applicant was properly admonished, in person, by the trial court concerning the consequences of his plea.

95.    The applicant's allegations of involuntary plea do not overcome the presumption of voluntariness created by the trial court's written admonishments, and fail to establish facts necessary to prove that he pled guilty based upon coercion from any source.

96.    In all things, the applicant has failed to demonstrate that his conviction was improperly obtained or that he is being improperly confined.

*Id.*, pp. 86–104 (record citations omitted). The trial court also made the following relevant

conclusions of law on collateral review:

3.    To prevail on a claim of ineffective assistance where the applicant pled guilty, the applicant must allege that but for the counsel's error, he would not have pled guilty and would have insisted on going to trial. The applicant does not make this allegation.

*    *    *    *

11.    Regarding the applicant's involuntary plea claim, a presumption of voluntariness is created in a plea if the defendant was admonished in accordance with the law, and then the burden of proving that a plea is involuntary shifts to the defendant. The applicant fails to carry his burden.

12.    Because the trial court properly admonished the applicant, there is a presumption that the applicant's guilty plea was voluntarily entered. The applicant does not overcome this presumption.

13.    When the records indicate that the applicant was admonished, there is a *prima facie* showing of a knowing and voluntary plea.

14.    The applicant has not overcome the presumption of regularity created by the official trial court documents in the primary case.

15.    The applicant does not overcome the presumption of voluntariness created by the trial court's written admonishments, and fails to establish facts necessary to prove that he pled guilty based upon coercion from any source.

\*     \*     \*     \*

18.    The applicant's guilty plea was made knowingly and voluntarily.

*Id.*, pp. 104–08 (citations omitted).    The Texas Court of Criminal Appeals expressly relied on these findings of fact and conclusions of law in denying habeas relief.  *Id.*, at cover.

As shown above, the state habeas court expressly found trial counsel's affidavit credible and her factual allegations true and correct.  The trial court further found that counsel did not coerce petitioner into pleading guilty, that both the trial court and trial counsel thoroughly admonished petitioner and ascertained that he was aware of his rights, and that petitioner understood everything that was happening during the plea proceedings. The trial court found that petitioner failed to demonstrate that his plea was the product of coercion, and it upheld the guilty plea.

A guilty plea generally waives constitutional deprivations occurring prior to the plea, *Haring v. Prosise*, 462 U.S. 306, 319–20 (1983), except as to a habeas claim challenging the validity of the guilty plea itself, *Matthew v. Johnson*, 201 F.3d 353, 364 (5th Cir. 2000).  Once a guilty plea has been entered, all non-jurisdictional defects in the proceedings are waived. *United States v. Bell*, 966 F.2d 914, 915 (5th Cir. 1992).  This waiver includes all claims of ineffective assistance of counsel except insofar as the alleged ineffectiveness relates to the making of the guilty plea itself.  *Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983).  If a petitioner challenges his guilty plea, there must be independent indicia of the likely merit of his contentions, and mere contradictions of his

statements made at the guilty plea will not carry his burden. *Davis v. Butler*, 825 F.2d 892, 894 (5th Cir. 1987). The validity of a guilty plea is a question of law and will be upheld on habeas review if entered into knowingly, voluntarily, and intelligently. *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000).

Here, petitioner has provided nothing more than his conclusory allegation that his plea was involuntary or coerced. Conclusory claims are insufficient to entitle a habeas corpus petitioner to relief. *Ross v. Estelle,* 694 F.2d 1008, 1012 (5th Cir. 1983). Petitioner has failed to allege any specific facts showing that he was not adequately informed of the nature of the charges against him or the consequences of pleading guilty prior to his guilty plea.

A review of the record shows that petitioner signed the "Judgment of Conviction by Court – Waiver of Jury Trial," and the "Waiver of Constitutional Rights, Agreement to Stipulate, and Judicial Confession." In these documents, petitioner acknowledged his rights, was informed of his range of punishment, and affirmed that his attorney "explained to me and I understand the legal effects of waiving my rights and the consequences of my plea." The court admonished petitioner as to the charges against him, and petitioner acknowledged in writing that he received and understood the trial court's admonishments. Petitioner does not overcome the presumption of regularity as to these documents, and fails to show that his plea was anything other than freely, voluntarily and knowingly made.

The state court rejected petitioner's claim that his guilty plea was involuntary and/or coerced. Petitioner fails to show that the state court's determination was contrary to, or

involved an unreasonable application of, federal law or was an unreasonable determination of the facts based on the evidence in the record.   Respondent is entitled to summary judgment dismissal of this claim.

### *Conclusion*

Respondent's motion for summary judgment (Docket Entry No. 12) is GRANTED and this lawsuit is DISMISSED WITH PREJUDICE.   A certificate of appealability is DENIED.   Any and all pending motions are DENIED AS MOOT.

Signed at Houston, Texas on November 30, 2015.

_____
Gray H. Miller
United States District Judge

23